UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

MARILYN D. HUGHES,                    )
                                      )
            Plaintiff,                )
                                      )
    vs.                               )        1:10-cv-806-SEB-DML
                                      )
CITY OF INDIANAPOLIS, Department of   )
Public Works,                         )
                                      )
            Defendant.                )


## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is now before the Court on Defendant's Motion for Summary Judgment

[Docket No. 66], filed on December 23, 2011.  Plaintiff, Marilyn D. Hughes, brings her

claim against her former employer, Defendant, the City of Indianapolis, Department of

Public Works ("the City"), for its allegedly discriminatory actions toward her based on

her gender in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e *et seq.*[1]  For the reasons detailed in this entry, we <u>GRANT IN PART</u> and

<u>DENY IN PART</u> Defendant's Motion for Summary Judgment.

---

[1] In her Complaint, Ms. Hughes also alleged claims of racial discrimination, retaliation, and breach of contract.  However, it appears she has abandoned these claims as she failed to respond to Defendant's arguments related to them or otherwise present evidence to support her allegations.  Because, under Seventh Circuit law, "unsupported and undeveloped arguments are waived," (<u>United States v. Turcotte</u>, 405 F.3d 515, 536 (7th Cir. 2005)), these claims are dismissed and we need not discuss the facts relevant to those abandoned theories.

## Factual Background

On August 12, 2002, Ms. Hughes began working as a dispatcher for the Indianapolis Department of Public Works ("DPW"). On March 13, 2006, she became a semi-skilled laborer within the DPW Operations Division and subsequently became a Maintenance Operations Technician on October 27, 2007. During all times relevant to this litigation, Ms. Hughes worked at DPW's West Street garage. On September 8, 2009, Ms. Hughes was terminated. The reason given for her termination was that she had engaged in unbecoming conduct while at work. At that time, Brian Lawrence was the assistant administrator who had authority over Ms. Hughes, Michael Dale was her manager, and Richard Scott and Mark Handcock were her supervisors.

**The Employment Manual and Workplace Policies**

Shortly after Ms. Hughes began her employment with DPW, on August 21, 2002, she signed an Employee Manual Acknowledgment form that stated that it was her responsibility to read the Manual, to ask questions of her supervisor if she required additional information about any of the items addressed in the Manual, and to abide by all of the information, policies, and procedures explained therein. In October 2003, the City revised its Employee Manual; thus, on December 1, 2003, Ms. Hughes signed another Employee Manual Acknowledgment form, agreeing to abide by all of the revised policies and procedures.

The City's Employee Manual contains a Standards of Conduct Policy which provides in relevant part as follows:

> [E]xamples of some types of conduct that may result in corrective action, up to and including discharge: ... 2. Insubordination or failure to follow instructions; ... 16. Threatening, coercing, intimidating or interfering with employees, customers, vendors, or visitors; ... 20. Use of loud, vulgar, profane, abusive, and/or obscene language ....

Ex. C-22 (Employee Manual) at 21. The conduct policy further provides that violations of "these Standards of Conduct, or any other policy or procedure set forth in this manual will result in corrective action, up to and including discharge." Id. The Manual also includes the City's Prevention of Violence in the Workplace Policy. Under the prevention of violence policy, workplace violence is defined as "[t]hreatening, intimidating, malicious, or violent behavior during work time or on city property, leased or owned." Id. at 19. The Manual further provides that such behavior "will **NOT** be tolerated during work time or on city property." Id. (emphasis in original).

The Employee Manual also contains the City's Workplace Harassment policy, which states that the City "is committed to providing a working environment that is pleasant, healthy, comfortable, and free from intimidation, hostility, or harassment of any kind." Id. at 6. The harassment policy prohibits harassment based on race or sex and defines harassment as including both "[u]nwelcome and objectionable conduct that prevents an individual from effectively performing the duties of his/her position or creates intimidating, hostile, or offensive working environment" and "[p]hysical conduct or gestures of an inappropriate or sexual nature." Id. at 6-7. The Manual instructs employees who become aware of an incident of harassment to "report the incident to his/her immediate supervisor or any representative of management, including a

Department Director or Human Resource representative, with whom he or she feels comfortable." Id. at 7. The harassment policy requires supervisors to report any allegations of harassment to human resources and provides that a supervisor's failure to report "may result in corrective action ...." Id. Any employee found to have harassed another employee "will be subject to corrective action up to and including discharge." Id.

The City also has a policy prohibiting discrimination in employment decisions, which states that the City "administers all terms and conditions of employment without regard to race, color, disability, religion, sex, age, national origin, or veteran status, except when such constitutes a bona fide occupational qualification." Id. at 6. This policy applies "to all terms, conditions, and privileges of employment including ... rehire [and] termination ...." Id.

**Plaintiff's Disciplinary Record and Termination**

During her tenure at DPW, Ms. Hughes was disciplined on five occasions for threatening, abusive, or discourteous conduct. On October 31, 2006, Ms. Hughes received a verbal warning for being "discourteous or disrespectful to [a] fellow employee." Ex. C-8. Almost one year later, on September 25, 2007, Ms. Hughes was disciplined for an incident in which she was alleged to have refused a "reasonable order of a supervisor" after she was instructed by her supervisor to clean up the garage and she replied that she was not going to comply with that instruction. As a result of this incident, Ms. Hughes received a written counseling notice. Ex. C-9. On January 12, 2009, she was issued a verbal warning for allegedly "cussing" and calling co-workers names. Ex. C-10.

On April 2, 2009, Ms. Hughes was disciplined after it was alleged that she had threatened, intimidated, and harassed her crew leader, Jerry Middleton. Mr. Middleton submitted a statement to DPW management complaining that Ms. Hughes had confronted him about a statement he had made about her at a crew meeting and told him: "I have no respect for you, and as long as you do as I say, everything will be alright [sic]." Exh. C-12. Middleton further alleged that, although he walked away in an attempt to avoid further confrontation, Ms. Hughes continued to repeat the same statement over and over again. Ms. Hughes contends that all she said was that she did not want to talk to him unless it was work related and if he abided by that, "they will be just fine." Hughes Dep. at 46.

As a result of this incident, Mr. Middleton stated that he felt he was working in a hostile environment and asked that Ms. Hughes be removed from his crew. Exh. C-12. Two members of Mr. Middleton's crew, Garland Graves and Jack Albright, had observed the incident and signed Middleton's prepared statement. Following an investigation into the incident, a supervisor at DPW concluded that Ms. Hughes had made threatening and intimidating remarks. Ms. Hughes was issued a written counseling notice and her supervisor noted that the incident was "a second instance" of such behavior and that "further infractions will be progressive in discipline." Id.

On September 2, 2009, Mr. Middleton submitted another statement to DPW management regarding an incident involving Ms. Hughes that occurred on August 31, 2009. According to Mr. Middleton, Ms. Hughes came up to him and stated, "I found

somebody that knows you, and I'm gonna get you." Exh. C-13. He responded, "So." Ms. Hughes then grinned at him and walked away. Ms. Hughes denies that she made such a statement. The next day, Mr. Middleton observed Ms. Hughes taking his picture. In his statement, Mr. Middleton wrote, "I am continually made to feel threatened when she is around. I feel that with her continued harassment, my place of business has become a hostile work environment." Id. As a result of these allegations, DPW Assistant Administrator Brian Lawrence conducted an investigation into Ms. Hughes's conduct and, after speaking with her co-workers, he determined that Ms. Hughes had on previous occasions made threats of violence and engaged in intimidating behavior towards other employees. For example, various co-workers stated that Ms. Hughes had called them names, including "Hollywood fag," "whore," and "retarded," and made such threats as she would "mop up for the floor with [a co-worker's] ass," that she was going to hit a co-worker in the head, and that "it would not be pretty" if complaints were made to the union. Exh. D-A.

On September 8, 2009, a pre-disciplinary meeting was held at which Mr. Lawrence discussed his findings with Ms. Hughes and her union representative. During that meeting, Ms. Hughes was terminated for unbecoming conduct and for violating the City's Standard of Conduct as described in the Employee Manual. Mr. Lawrence prepared a report memorializing his findings and noting that Ms. Hughes "has been warned in the past that this is not acceptable behavior and has been disciplined for this on 1/12/2009 and 4/02/2009." Exh. C-14. Ms. Hughes challenged her termination through

the available two-step grievance procedure, but her termination was upheld.  Exhs. C-15;

C-16.

**Plaintiff's EEOC Charges**

Following her termination, Ms. Hughes filed two EEOC charges.  In the first

charge, filed the same day as her termination, she alleged that her termination was

discriminatory.  Specifically, Ms. Hughes alleged as follows:

> I began employment with the City of Indianapolis in August 2002.  Around
> 2006 I transferred to working in the Department of Operations.  I was one
> of two female employees working in the garage and I believe that the male
> employees were intimidated by my strong work ethic and ability to perform.
> On September 2, 2009 Assistant Administrator Brian Lawrence suspended
> me for alleged threats.  Mr. Lawrence refused to provide any information
> about the alleged threats.  I deny that I made any threats.  However, I was
> terminated on September 8, 2009.

> Other male employees have made threats and/or fought without being
> terminated.  I am aware that Department of Operation workers Henry
> Johnson and Eli McDaniel were both placed on "final notice" after having
> made threats.

> I believe that I have been discriminated against due to my sex, female, in
> violation of Title VII of the Civil Rights Act of 1964, as amended.

Exh. A.

Ms. Hughes filed a second charge, approximately five months later, on February

22, 2010.  In that charge, she added additional claims of racial discrimination and

retaliation, and also alleged that she had been subjected to an employee's sexual gestures

in May 2009.  The narrative section of her charge provided as follows:

> I am a Black female who began employment with the City of Indianapolis
> on August 2, 2002.  My job title was Dispatcher.

In May 2009, I reported to Manager Greg [Morse][2] sexual gestures that I was subjected to by Richard Scott. Mr. [Morse] said that he would talk to Richard about the situation. Richard continued the sexual gestures. I then reported the situation to Union Stweard Kenny Stringer. Mr. Stringer laughed.

I was terminated September 8, 2009, by Assistant Administrator Brian Lawrence, for threatening a co-worker. This was untrue. I filed an EEOC [charge] the same day. To day [sic] I have not been rehired. Randall Irvin (White) was terminated for shoving another employee and he was rehired.

I believe I have been discriminated against due to my sex, female, race, Black, and retaliated against for filing an EEOC charge which is a violation of the Title VII Civil Rights Act of 1964, as amended.

Ex. B.

**Plaintiff's Sexual Harassment Allegations**

The only sexual harassment allegations contained in Ms. Hughes's EEOC charges relate to sexual gestures allegedly made by Richard Scott, a supervisor at DPW. According to Ms. Hughes, "Scott would look at [her], open his mouth and roll his tongue down up underneath his chin and back in his mouth." Exh. I at 5. When asked at her deposition to clarify the gesture allegedly made by Mr. Scott, Ms. Hughes testified that, while looking directly at her, Scott "would open up his mouth, roll his tongue around and flip his tongue up underneath his chin." Hughes Dep. at 56. Ms. Hughes testified by deposition that she first complained about Mr. Scott's behavior in May or June of 2009

---

[2] Although Ms. Hughes stated her manager was "Greg Morris" in her EEOC charges, her manager's last name is actually spelled "Morse"; thus we refer to him as such throughout this order.

and made a second complaint when "it happened again." Id. at 68. Ms. Hughes acknowledges that she did not file a formal complaint about this behavior, but contends that she made a verbal complaint to her manager at the time, Greg Morse. Mr. Morse denies that Ms. Hughes made such a report to him.[3]

Although she did not include the following allegations in either of her EEOC charges, Ms. Hughes now claims that she was also subjected to sexual harassment from other employees during her tenure with the DPW. According to Ms. Hughes, in May 2006, co-worker Tony Dilosa made derogatory comments about her rear end and when she complained to Danny Quintana, who was her supervisor at the time, he told her, "[T]hese guys are men, don't think because you are here they are going to change. Keep your mouth closed and go with the flow." Id. at 61.

Later that year, in October 2006, fellow employee, William Abney, allegedly called Ms. Hughes a "black bitch" after she refused to purchase a product he was selling. Ms. Hughes reported the comment to Mr. Quintana, but he informed her he was not going to get involved. When Mr. Abney continued to make derogatory comments, she called him "retarded." Mr. Abney reported the incident to Mr. Quintana who gave Ms. Hughes a verbal warning as discipline for violating the courtesy and disrespect clause. Id. at 41-42. In 2007, another co-worker, Sam Walton, allegedly called Ms. Hughes a "lazy black

---

[3] At some point after Ms. Hughes was terminated, another female employee complained that Mr. Scott had engaged in inappropriate behavior. Following an investigation, Mr. Scott was terminated for violating the City's sexual harassment policy.

bitch" in front of Willie Harrington, the supervisor at the time. Ms. Hughes asked Mr. Harrington to write up Walton, but he refused to get involved and walked away. Id. at 60-61.

During the time period that Ms. Hughes worked on the guardrail crew, from mid-2008 to April 2009, another co-worker, Jerry Woods, allegedly made comments about the size of women's breasts, stating "how he could put his head between a breast, how he would love to suck those big ass tits, things of that nature." Id. at 77. In the winter of 2009, a number of male employees also allegedly made comments in Ms. Hughes's presence about the size of another female employee's vagina. According to Ms. Hughes, in the spring of 2009, Mr. Middleton refused to train Ms. Hughes on the pounder truck, stating that he would not train a woman on the truck, and also called her a "dirty ho" in the presence of their supervisor, Mr. Harrington. Id. at 63-64. While Ms. Hughes worked on Eligh McDaniels's crew between April and September 2009, she contends that once or twice each week, Mr. McDaniels would put two fingers in a "V" or "peace sign" shape and lick in between them while looking at her. Id. at 65. Ms. Hughes contends that she reported these incidents to Mr. Quintana, Mr. Harrington, and Mr. Morse, but nothing was ever done.

**The Instant Litigation**

On April 20, 2010, the EEOC issued Ms. Hughes right to sue letters for both of the charges she had filed. On June 24, 2010, Ms. Hughes filed her original complaint, which was subsequently amended on March 2, 2011, alleging claims for sexual harassment, race

and sex discrimination, and retaliation, all in violation of Title VII, and various breach of contract claims. The City filed its motion for summary judgment on all claims on December 23, 2011.

**Legal Analysis**

## I.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. <u>See</u> <u>id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u>, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. <u>Michas v. Health Cost Controls of Ill., Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323.

11

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment

discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Hostile Work Environment

Ms. Hughes contends that the City subjected her to sexual harassment, in violation of Title VII, by allowing several employees' sexually offensive behavior to continue after she had complained to her supervisors.  The City rejoins that most of Ms. Hughes's allegations relating to her hostile work environment claim are outside the scope of her EEOC charge and thus cannot be considered, and further, that the allegations that do survive are not sufficiently severe or pervasive to be actionable.

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge."  Cheek v. W. & S. Life. Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994) (citation omitted).  This rule is in place to "afford[] the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion" and to "giv[e] the employe[r] some warning of the conduct about which the

13

employee is aggrieved." Id. (citations omitted). "[A] claim in a civil action need not be a replica of a claim described in the charge, but there must be 'a reasonable relationship between the allegations in the charge and the claims in the complaint,' and it must appear that 'the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.'" Vela v. Village of Sauk Village, 218 F.3d 661, 664 (7th Cir. 2000) (quoting id.). In order to be reasonably related, "the EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals." Cheek, 31 F.3d at 501 (emphasis removed).

Clearly, Ms. Hughes is foreclosed from asserting factual allegations in her Amended Complaint which are outside the scope of her EEOC charges to support her sexual harassment claim. Here, Ms. Hughes's February 22, 2010 EEOC charge addressing her sexual harassment claim alleges only that, in May 2009, she reported to her manager, Greg Morse, that she had been subjected to "sexual gestures" by a supervisor, Richard Scott and that, when Scott made the sexual gestures on a subsequent occasion, she reported the situation to Union Steward Kenny Stringer who allegedly laughed at her. There is no mention of any of the other incidents of sexually harassing behavior alleged to have been committed by other co-workers that have been included in her Amended Complaint and that she attempts to rely upon to support her hostile work environment claim. Because the additional allegations contained in her Amended Complaint involve entirely different conduct and individuals than the allegations in her EEOC charge, they cannot "reasonably be expected to grow out of an EEOC investigation

14

of the allegations in the charge." <u>Jones v. Res-Care, Inc.</u>, 613 F.3d 665, 670 (7th Cir.

2010) (quoting <u>Vela</u>, 218 F.3d at 664). Accordingly, we will limit our review to the

allegations Ms. Hughes related to Mr. Scott to support her hostile environment claim.[4]

In order to survive summary judgment on this claim, Ms. Hughes must establish

that: "(1) her work environment was both objectively and subjectively offensive; (2) the

harassment complained of was based on her gender; (3) the conduct was either severe or

pervasive; and (4) there is a basis for employer liability." <u>Scruggs v. Garst Seed Co.</u>, 587

F.3d 832, 840 (7th Cir. 2009) (citing <u>Dear v. Shinseki</u>, 578 F.3d 605, 611 (7th Cir.

2009)). In order to be actionable, the sexual harassment must be so severe or pervasive as

"'to alter the conditions of ... employment and create an abusive working environment.'"

<u>E.E.O.C. v. Management Hospitality of Racine, Inc.</u>, 666 F.3d 422, 432 (7th Cir. 2012)

(quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)). To determine

whether the alleged harassment rises to this level, courts assess the totality of the

circumstances, including, "'the severity of the allegedly discriminatory conduct, its

frequency, whether it is physically threatening or humiliating or merely offensive, and

---

[4] Some of the harassing behavior that Ms. Hughes alleges in her Amended Complaint
(but did not include in her EEOC charge) occurred outside of the limitations period. It is true, as
Ms. Hughes argues, that, because hostile work environment claims "are based on the cumulative
effect of individual acts," <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115
(2002), a plaintiff can rely on events occurring outside the limitations period to support a hostile
work environment claim "so long as an act contributing to that hostile environment takes place
within the statutory period." <u>Id.</u> at 105. However, events occurring outside the statute of
limitations must still bear some reasonable relation to the allegations set forth in the plaintiff's
EEOC charge. Because the allegations contained in the Amended Complaint that fall outside of
the statute of limitations all involve different conduct and individuals than Ms. Hughes described
in her EEOC charge, they cannot be saved by the continuing violation doctrine.

whether it unreasonably interferes with an employee's work performance.'" Overly v. KeyBank Nat. Ass'n, 662 F.3d 856, 862 (7th Cir. 2011) (quoting Scruggs, 587 F.3d at 840).

Because the majority of Ms. Hughes's sexual harassment allegations occurred outside the scope of her EEOC charge, the only remaining, actionable allegations are those related to Mr. Scott's behavior. Ms. Hughes alleges that Mr. Scott looked directly at her and "open[ed] up his mouth, roll[ed] his tongue around and flip[ped] his tongue up underneath his chin." Hughes Dep. at 56. Ms. Hughes testified that she complained of his behavior in May or June of 2009 and then complained a second time when "it happened again." Id. at 68. Even viewing the facts in a light most favorable to Ms. Hughes, as we are required to do at this stage in the litigation, these allegations are simply not sufficiently severe or pervasive to be actionable. Although such gestures are unquestionably childish, the conduct is not particularly threatening, humiliating, or offensive so as to significantly interfere with Ms. Hughes's work performance such that it would constitute a change in the terms and conditions of her employment. Moreover, Ms. Hughes alleges that this behavior occurred on only two occasions. It is well-settled under Seventh Circuit law that "'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim." Saxton v. Am. Telephone and Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993) (citing Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993)). Accordingly, we GRANT Defendant's Motion for Summary Judgment on Plaintiff's sexual harassment claim.

## III.    Discriminatory Termination

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove discrimination under Title VII either with direct evidence of discrimination or indirectly through the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Scaife v. Cook County, 446 F.3d 735, 739 (7th Cir. 2006).  The parties begin by addressing the indirect method, so we follow their lead and begin with a discussion of that avenue of proof.

Under the McDonnell Douglas framework, a plaintiff generally must begin by establishing a *prima facie* case of discrimination.  If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff.  If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual. Naik v. Boehringer Ingelheim Pharmaceuticals, Inc., 627 F.3d 596, 599-600 (7th Cir. 2010) (citations omitted).  The traditional *prima facie* case requires a showing by the plaintiff: (1) that she was part of a class of persons protected by Title VII; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly-situated individuals outside her protected class

were treated more favorably.  Id. (citing Hildebrandt v. Illinois Dep't of Natural Resources, 347 F.3d 1014, 1030 (7th Cir. 2003)).

The City does not challenge the first and third prongs of Ms. Hughes's *prima facie* case, to wit, that she is a member of a protected class and that she was terminated, which constitutes an adverse employment action. Thus, in determining whether Ms. Hughes established a *prima facie* case, we need only consider whether she was meeting the City's legitimate job expectations and whether similarly situated male employees received more favorable treatment.

### A.     *Prima Facie* Case

The City maintains that Ms. Hughes was not meeting its legitimate performance expectations because she engaged in threatening behavior toward other employees, in violation of its Standards of Conduct.  Ms. Hughes does not deny that she engaged in at least some of the behavior that the City contends violated its Standards of Conduct and led to her termination.[5]  However, she maintains that four male employees engaged in similar or arguably more serious conduct but were not terminated.  Thus, the issue here is whether the City applied its legitimate employment expectations in a discriminatory manner.  "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male ... employees in a more favorable manner),

_____

[5] Ms. Hughes does deny that she told Mr. Middleton, "I found somebody that knows you, and I'm gonna get you."  Pl.'s Resp. at 7.

the second and fourth prongs of <u>McDonnell Douglas</u> merge – allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry." <u>Peele v. Country Mut. Ins. Co.</u>, 288 F.3d 319, 329 (7th Cir. 2002) (citations omitted).

Ms. Hughes claims that, although the City terminated her for threatening other employees, it did not terminate similarly situated male employees and instead afforded them the benefit of the progressive discipline policy. For an employee to be similarly situated to a plaintiff for purposes of Title VII comparison, a plaintiff "must show that there is someone who is directly comparable to her in all material respects." <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676, 680 (7th Cir. 2002). The comparator must be similar "in terms of performance, qualifications, and conduct. ... This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-18 (7th Cir. 2000) (citations omitted).

"In a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline." <u>Coleman v. Donahoe</u>, 667 F.3d 835, 850 (7th Cir. 2012) (quoting <u>Naik</u>, 627 F.3d at 600). "Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that [the plaintiff] has met [her] burden on the issue.'" <u>Coleman</u>, 667

F.3d at 846-47 (quoting <u>Srail v. Village of Lisle</u>, 588 F.3d 940, 945 (7th Cir. 2009)).

In support of her argument, Ms. Hughes identifies four employees as comparators: Randall Irvin, William O'Fallon, Eligh McDaniels, and George Bryant. The parties do not dispute that Ms. Hughes and the individuals she identified as comparators shared the same supervisor(s), had similar qualifications, and were subject to the same standards. The City contends that they are nonetheless not similarly situated for Title VII purposes because the nature of their conduct is obviously distinguishable. Specifically, the City argues that Ms. Hughes had a documented history of insubordination and threatening behavior, while none of the individuals she identified as being similarly situated had such extensive disciplinary records.

We agree with the City that Eligh McDaniels, who was disciplined only one time, eight years prior to Ms. Hughes's termination, for a single threat that he "was going to kick [a co-worker's] ass," is not similarly situated to Ms. Hughes. This one incident, which took place years before the events occurred at issue in this litigation, is clearly distinguishable from the numerous negative comments and threats attributed to Ms. Hughes by various co-workers.

 The other employees identified by Ms. Hughes cannot be distinguished so easily, however. Randall Irvin and William O'Fallon were each disciplined following an incident at a public job site in which Mr. Irvin "bumped" Mr. O'Fallon with the Gehl Bobcat machine he was operating, knocking Mr. O'Fallon to the ground. When Mr. O'Fallon stood up, Mr. Irvin allegedly told him, "If you don't get out of the way, I will hit

20

you again." O'Fallon Dep. at 9. In response, Mr. O'Fallon threw a broom at Mr. Irvin who threw it back at O'Fallon. Neither Irvin nor O'Fallon reported the incident to their supervisors. However, a citizen witnessed the events and telephoned the DPW to complain. Mr. Irvin was originally terminated by his supervisor, Michael Dale, for unbecoming behavior (the same reason given for Ms. Hughes's termination) as well as "damag[ing] the city's reputation and the public trust by ... intentionally using a piece of city equipment to inflict bodily injury to another employee, while out on the jobsite." Exh. C-17. Mr. Irvin filed a grievance and his termination was subsequently overturned by Brian Lawrence, citing the fact that the union steward, Kenneth Stringer, explained that the incident could have been an accident and that Irvin may not have intentionally hit Mr. O'Fallon. Mr. Irvin was instead placed on a 90-day probationary period and was not terminated. Mr. O'Fallon received a written warning for throwing the broom.

There is also evidence in the record that, in addition to this incident, both men had engaged in insubordination and other misconduct on prior occasions. Mr. Irvin had received various written notices during his tenure with the City for such offenses as refusing assignments, using profanity, "name calling," and telling his crew leader to "suck his dick." Mr. O'Fallon was previously disciplined a number of times, including, on one occasion, for telling his supervisor, "[you] don't have a fucking clue." On another occasion, one of Mr. O'Fallon's co-workers, William Pagel, reported to their supervisor

that O'Fallon had twisted Pagel's wrist and injured it.[6]

It is true that Ms. Hughes, Mr. Irvin, and Mr. O'Fallon did not violate the City's policies in an identical manner. However, the Supreme Court has made it clear that "precise equivalence in culpability between employees" is not required to establish that they are similarly situated. McDonald v. Santa Fe Trail Trans. Co., 427 U.S. 273, 283 n.11 (1976). Instead, "in deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." Peirick v. Indiana University-Purdue University Indianapolis Athletics Dept., 510 F.3d 681, 689 (7th Cir. 2007) (citations omitted). Here, a jury could reasonably conclude that Mr. Irvin and Mr. O'Fallon's physical altercation at a public jobsite, coupled with their prior disciplinary history, was comparable to the seriousness of the conduct for which Mr. Hughes was terminated. See Coleman, 667 F.3d at 851 ("[A]t the summary judgment stage, the employer cannot defeat a plaintiff's prima facie case of discrimination on the theory that it applied its 'no tolerance' policy on threats to some workers while dismissing dangerous acts of others as mere 'horseplay.'").

The final employee Ms. Hughes has identified is George Bryant, who allegedly made threatening remarks to a co-worker, Richard Allen, over a number of months, but received no discipline other than a lateral transfer. The City contends that, although both Ms. Hughes and Mr. Bryant allegedly engaged in threatening behavior, Mr. Bryant is not

---

[6] Mr. O'Fallon contends he was merely engaging in horseplay, but it is not clear from the record whether Mr. Pagel characterized it as such when he reported the incident.

similarly situated to Ms. Hughes because his conduct was never reported, and thus, no supervisors were aware of his alleged misconduct.  However, Mr. Allen testified by deposition that some of Mr. Bryant's comments were made directly in front of supervisors and that he (Allen) reported other incidents to supervisors, including Mr. Lawrence.  According to Mr. Allen, he had three meetings with Mr. Lawrence and reported that Mr. Bryant was "making my job miserable every day" by "always wanting to fight" and "cussing at me."  Allen Dep. at 11.  Mr. Allen further testified that he also told supervisors that Mr. Bryant would repeatedly tell Allen about all of the guns he owned and would talk about shooting people, which Allen believed was a "veiled threat."  Id. at 36-38.  Determining whether the same supervisors responsible for Ms. Hughes's termination were in fact aware of Mr. Bryant's arguably similar behavior will require credibility determinations that cannot be made at summary judgment.  Such fact issues must be determined by the jury.

For the reasons detailed above, we find that Ms. Hughes has identified three male comparators who dealt with the same supervisor(s), were subject to the same standards, and engaged in conduct that a reasonable jury could find was of comparable seriousness and yet were not disciplined as harshly as she.  This is sufficient at this stage of the litigation to permit a reasonable inference of discrimination, and thus, we proceed to the pretext discussion.

### B.    Pretext

The City has offered a legitimate nondiscriminatory reason for terminating Ms.

Hughes, to wit, that she threatened other employees and had a history of insubordination. But as discussed above, Ms. Hughes has presented evidence that three male employees engaged in behavior that a reasonable jury could find was comparably serious and were not discharged. This inconsistency creates a genuine issue of material fact as to whether the City's stated reason for terminating Ms. Hughes was a pretext for discrimination. See Coleman, 667 F.3d at 853 ("As the Supreme Court, this court, and other circuits have held, a discrimination plaintiff may employ such comparator evidence to discharge her burden at the pretext stage as well as to satisfy the fourth element of her prima facie case."). There are possible nondiscriminatory explanations for this disparity that the City has put forth – that no supervisor was made aware of Mr. Bryant's misconduct and that the incident involving Mr. Irvin and Mr. O'Fallon was an accident or misunderstanding and thus less serious than the threats made by Ms. Hughes – which it is obviously free to present at trial. However, as discussed above, determining whether these explanations ring true will require credibility determinations that cannot be made on summary judgment. Accordingly, we DENY the City's Motion for Summary Judgment as to Ms. Hughes's discriminatory termination claim.[7]

## IV. Conclusion

For the reasons detailed in this entry, we GRANT IN PART Defendant's Motion

---

[7] Because, for the reasons described *supra*, we find that there is sufficient evidence under the indirect method of proof to preclude summary judgment, we need not address the parties' arguments under the direct method.

for Summary Judgment as to Plaintiff's hostile work environment claim as well as her claims of racial discrimination, retaliation, and breach of contract, and <u>DENY IN PART</u> as to Plaintiff's claim for discriminatory termination. Trial on the merits of that claim will proceed in due course.

      IT IS SO ORDERED.


Date: _____05/14/2012_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE LLP
wgroth@fdgtlaborlaw.com

Justin F. Roebel
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
jroebel@indygov.org

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org